**UNITED STATES**

v.

**William John SIMPSON, Paul James Chambers, Ronald Smith, Michael T. Landini.**

**Cr. No. 207-58.**

United States District Court
District of Columbia.
June 4, 1958.

**678**

Fred McIntyre, Asst. U. S. Atty., Washington, D. C., for the United States.

Joseph P. Adams, Peter G. Chaconas, Washington, D. C., for defendant Simpson.

Joseph Levin, Washington, D. C., for defendant Chambers.

James C. Toomey, Washington, D. C., for defendant Smyth.

KEECH, District Judge.

Trial by jury having been waived, the court has for determination the guilt or innocence of the defendants, Simpson, Chambers, and Smyth, all young members of the Air Force, who are charged with robbing Joseph J. Costantino, an employee of the Federal Bureau of Investigation, on Mississippi Avenue, S. E., shortly after midnight on December 27, 1957, when he was en route home from his employment.

There is no challenge of the fact that the complainant was yoked and robbed. Indeed, each of the defendants here on trial has voluntarily admitted the robbery, and their codefendant, Landini, has pleaded guilty in another federal district.

Mr. Costantino testified that shortly prior to the robbery, while he was walking alone on Wheeler Road, he saw approximately three men coming toward him on the opposite side of the street. After he turned on Mississippi Avenue some one yoked him from behind, while another person removed his wallet from his rear pocket. One of the assailants told him they wanted his wallet and not to make trouble, saying, "Don't try anything foolish. I have something here that will fix you good." A taxicab approached, complainant tried to stop it, at that moment the robbers ran back toward Wheeler Road, and he lost sight of them in traffic. Inasmuch as both of the robbers approached him from the rear, complainant had a brief view of only one of them. To the best of his ability he gave the police a description of this man, which did not fit any of the defendants here on trial.[1] At no time was he able to identify Simpson, Chambers, or Smyth as one of the persons who robbed him.

---

1. The description applied to the codefendant Landini.

Some time thereafter the complainant received certain information as to who might have been involved in the robbery, which he passed on to the F.B.I.

On February 11, 1958, Special Agent Buscher of the F.B.I. went to Bolling Air Force Base, which is near the scene of the robbery, and there interviewed two men. One related that he had heard an airman, Landini, say that shortly after Christmas he had robbed a man on Wheeler Road of over $100 and name two others who participated in the robbery, the defendants Chambers and Simpson. Another airman gave Agent Buscher essentially the same story as the first, but was able to recall the name of only Landini, although he knew by sight the other two mentioned by Landini, and also knew their positions at the Base.

Agent Buscher then contacted Detective Xander of the Metropolitan Police Department. Detective Xander, accompanied by two other police officers, met Agent Buscher at about 2 p. m. of the same day at the administrative office of the Provost Marshal at Bolling Air Force Base. Agent Buscher gave Detective Xander the names of the two persons he had interviewed and their story concerning the robbery, including the names of Landini and all three of the defendants here on trial, Simpson, Chambers, and Smyth, as being implicated in the robbery. Thereafter Detective Xander requested of and was given permission by the Provost Marshal to talk with the defendants.

Sergeant Adams, an air policeman, was sent to bring each of the defendants to the Provost Marshal's office in an air police vehicle. He was not armed, did not place any of the defendants under arrest, and, in fact, did not know why their presence was required by the Provost Marshal.

Landini was no longer at the Air Base and, as stated before, he has pleaded guilty in another jurisdiction.

The defendants, Simpson, Chambers, and Smyth, were brought in one by one. During all of the interviews, there was present as an observer for the Air Force, a Mr. Matthews, a Special Agent of the Office of Special Investigation of the Air Force, a military man who performed his duties in plain clothes. When each of the defendants was brought in, Major Hebert, the Provost Marshal, introduced the police officers and Mr. Matthews, advised the defendant that these were civilian authorities from off base who would like to talk with him about a case, and stated that Mr. Matthews would be present as a representative of the Air Force while the police talked to him. Major Hebert did not listen to the interviews but concerned himself with other duties. Mr. Matthews remained throughout the interviews, but took no part therein.

There is no evidence that anyone cautioned the defendants that they did not have to talk to the police, or advised them that anything they said might be used against them. Major Hebert testified that there was no occasion for him so to advise the defendants and that it was not his responsibility. Mr. Matthews testified that he did not do so, as he was ordered to be present at the interview merely as an observer for the Air Force.

The defendant Simpson was interviewed first, starting at about 3 p. m. Detective Xander testified that, after Major Hebert had introduced him, he told Simpson that he was there to investigate a robbery, that he had certain information and wanted to question Simpson regarding the case. At the beginning Simpson disclaimed any knowledge of the robbery, but a minute or two later he told Detective Xander that about 11 p. m. on December 26th, while in his room with Chambers, Smyth, and Landini, he had jokingly said, "Let's go out and yoke somebody." Someone said, "Let's go," and a few minutes later the four of them left the barracks and started walking. Simpson said he did not know the names of the streets, but they might have been on Wheeler Road. After they had walked some distance from the base, Chambers said, "There is a man over there." They observed the complainant walking north

on Wheeler Road and then turn on Mississippi Avenue. Landini and Simpson ran after complainant. Landini grabbed complainant around his neck, forcing him to the ground, while Simpson went to the front of complainant and demanded his money. When complainant made no reply, Simpson started searching and found his wallet in his trousers pocket. After Simpson got the money, Landini released his hold on the complainant and told him to continue walking and to make no outcry, that "he had something that would take care of him." Chambers and Smyth did not come up on the immediate scene, but stood back at a distance. A cab came by about that time and the four of them ran. They went through a wooded area and came out somewhere near a school building. There they stopped while Simpson counted the money and found $103. They then agreed to separate. Simpson and Chambers went in one direction and Smyth and Landini in another. Later they met in a room at the barracks and Simpson divided the money, keeping $26, giving Chambers and Smyth each $25, and $27 to Landini, who claimed he did all the "dirty work." The billfold was thrown into a sewer somewhere near Bolling Air Force Base by Landini. At about 3:30 p. m. Simpson was escorted by an air policeman back to his quarters to change to civilian clothes and was then returned to the Provost Marshal's office.

The defendant Chambers was next interviewed by Detective Xander, in the presence of the same persons, beginning at approximately 3:45 p. m. Chambers readily admitted his part in the robbery. His story of the conversation in the barracks preceding the robbery was similar to that of Simpson, as was his story of the offense. He saw Simpson and Landini run toward the complainant, saw Landini grab the complainant, forcing him to the ground, and saw Simpson bending over him. He said he and Smyth were standing about forty or fifty feet away from this scene. When asked if he were serving as a look-out, he hesitated and said, "Well, not exactly," but added,

"You might say that we were looking for someone that might come along." He corroborated that the four of them ran when a cab came by, and that he had received $25 as his share when they met later. Detective Xander finished talking to Chambers about 4:05 p. m.

Within fifteen or twenty minutes later Smyth was brought in. After Major Hebert had identified the police officers and Mr. Matthews, Detective Xander told Smyth he was there as a Metropolitan Police officer to investigate a robbery which had occurred some time before on Mississippi Avenue and that he had information that Smyth was involved. Smyth at first denied the yoking, but after he was confronted with the information they had already received, Smyth, too, admitted his participation in the offense. He admitted he had been with the others when Simpson said, "Let's go out and yoke somebody;" that they had gone walking; that he heard Chambers say, "There is a man over there;" that he saw Simpson and Landini run after the man, saw Landini grab him, forcing him down, and saw Simpson bending over him. Smyth also admitted that he had received $25 as his share. He said he was not at the immediate scene of the offense and had stood back a little, but admitted that he was looking for anyone who might come by.

After Detective Xander had talked to all three of the defendants, he inquired of the Provost Marshal whether the men could be released to him or whether he would have to obtain warrants. After consultation with a legal officer, Major Hebert informed Detective Xander that the defendants could be turned over to him upon his signing receipts for them. This was done, and the three defendants were at that time placed under arrest by Detective Xander. The defendants were then taken to No. 11 Precinct, about ten minutes from the Base, and there booked for investigation at approximately 5:30 p. m. Detective Xander testified that they were not booked on a robbery charge until about an hour and fifteen minutes later, after they had been con-

fronted by the complainant Costantino, who came to the Precinct at about 6:45 p. m. The defendants were arraigned before the United States Commissioner at about 10 a. m. the next morning.

The evidence as to the defendants' oral admissions and confessions was received subject to a motion to suppress. The defendants were permitted to testify solely for the purpose of the motion to suppress. All evidence of incriminating statements by any of the defendants after their arrest by Detective Xander or after arraignment was excluded.

No evidence was adduced on behalf of the defendants. Their sole defense is their motion to suppress the confessions as inadmissible upon two grounds: (1) the rule laid down in Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479; and (2) the prohibitions of Article 31 of the Uniform Code of Military Justice.[2]

Counsel concede that if the question of the admissibility of the confessions were limited to the protection of the Fifth Amendment there could be no challenge, inasmuch as the defendants' admissions were all voluntary, and all three defendants testified that no physical force was employed and there were no mental coercion and no promises.

In the Mallory decision, supra, 354 U.S. at pages 451 et seq., 77 S.Ct. at pages 1357, the Supreme Court held inadmissible incriminating statements elicited from a defendant during a period of unlawful detention, where there had been a failure to comply with the requirement of Rule 5(a), Federal Rules of Criminal Procedure, 28 U.S.C., that the defendant be arraigned before a committing magistrate without "unnecessary delay" after arrest. In this Circuit there is wide variance in the judicial interpretations of the Mallory rule, as applied to different fact situations.[3] The Supreme Court, however, stated the rationale of its decision in the following paragraphs (354 U.S. at pages 454, 456, 77 S.Ct. at page 1359):

"The scheme for initiating a federal prosecution is plainly defined. The police may not arrest upon mere suspicion but only on 'probable cause.' The next step in the proceeding is to arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined. The arrested person may, of course, be 'booked' by the police. But he is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt.

"The duty enjoined upon arresting officers to arraign 'without unnecessary delay' indicates that the command does not call for mechanical or automatic obedience. Circumstances may justify a brief delay between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties. But the delay must not be of a nature to give opportunity for the extraction of a confession.

\*  \*  \*  \*  \*  \*

" \* \* \* Presumably, whomever the police arrest they must arrest on 'probable cause.' It is not the function of the police to arrest, as it were, at large and to use an interrogating process at police headquarters in order to determine whom they should charge before a committing magistrate on 'probable cause.' "

It is therefore necessary to examine the facts in the instant case to determine, first, whether there was an arrest; sec-

---

2. Erroneously cited by counsel as 50 U.S. C.A. § 602, which was repealed August 10, 1956, effective January 1, 1957, and recodified as 10 U.S.C. § 831.

3. Trilling v. United States, D.C.Cir., —— F.2d ——, decided April 17, 1958.

ond, if so, whether under the particular circumstances there was any unnecessary delay in taking the defendants before a committing magistrate.

Detective Xander testified that, after being informed that the defendants could be released to him without the necessity of obtaining warrants, he obtained their custody upon signing of receipts, whereupon he placed the defendants under arrest. This was *after* all three had been interviewed and *after* their incriminating admissions. During the questioning, Detective Xander, having no jurisdiction on the Air Base, had no custody or control of the defendants. He did not even know where they went when they left the room.

Defense counsel contend, however, that the detention of the defendants in the Provost Marshal's office during the police interviews amounted to an arrest—by whom, it is not clear. Certainly, the civilian police could make no arrest on the Base without the permission of the military authorities. Major Hebert, the Provost Marshal, testified that he made no arrest and authorized none by the air police, but merely ordered the defendants to come to his administrative office so that the local police could talk with them. Sergeant Adams, the air policeman who brought the defendants there, did not place them under arrest, but merely escorted them to the Provost Marshal under a military order. Although the defendants did not feel free to refuse to accompany Sergeant Adams or free to absent themselves from the interview, it was by virtue of a military order rather than any arrest.

■ Under these facts, the court finds that the three defendants were not under military arrest or custody other than such control as flows from regular military service, nor were they under arrest or in custody of the civilian authorities until—and only when—they were officially turned over to the police by the military authorities. As stated before, there has not been admitted in evidence in this case any admission or confession made by any of the defendants after he was released to the police.

■ Even assuming the defendants to have been in custody or under arrest by the military at the time they were interviewed by Detective Xander in the Provost Marshal's office, under the facts peculiar to this case, I find there had been no unnecessary delay in taking them before a committing magistrate at the time of defendants' admissions or confessions in that office. Although the police had probable cause to make an arrest outside the Base, the police interview of the defendants in the Provost Marshal's office clearly was warranted for the purpose of securing their release by the military authorities. There was no protracted questioning of any of the defendants before his admission of guilt. It was only fair that they be confronted with the information previously received by F.B.I. Special Agent Buscher and the police, to give them an opportunity to clear themselves before being turned over to the police. Instead, within a few minutes, the defendants admitted their complicity in the offense.[4]

4. The voluntary nature of the defendants' admissions is apparent from the following excerpts from their testimony:

Defendant Chambers, on cross-examination by the Assistant United States Attorney:

"Q. In fact, you were perfectly willing to give any information that you could to the police officers, weren't you? A. Well, I told them what I knew, what was going on, was the best thing for me to do.

"Q. So you wanted to make a full story there of what you knew about it?

A. Yes."

Defendant Smyth, on cross-examination by the Assistant United States Attorney:

"Q. And didn't they ask you if you would answer some questions? A. Yes, sir, they did.

"Q. That was the way it was put to you, wasn't it? A. Yes, sir.

"Q. What did you say A. I said yes.

"Q. You said yes? A. Yes.

"Q. And then you proceeded to answer some questions, is that not right? A. Yes, sir."

█ Inasmuch as the police had probable cause upon which to arrest the defendants before they talked with them, the questioning in the Provost Marshal's office was clearly not "an interrogating process * * * in order to determine whom they should charge before a committing magistrate on 'probable cause,'" within the rule of the Mallory case, supra.

It is therefore immaterial whether there was any unnecessary delay in arraignment after the arrest by Detective Xander, since it would not affect the admissibility of voluntary confessions made prior to the arrest.[5]

█ Insofar as Article 31 of the Uniform Code of Military Justice[6] is concerned, it bears no application to the admissibility of the confessions in this trial. Even if it be assumed that, pursuant to subparagraph (b) thereof, the defendants should have been advised by the military authorities of their right to remain silent and the possible use against them of any admissions or confessions they might make, failure so to advise them, under subparagraph (d), would make their confessions inadmissible only in a court martial, not in a criminal trial in a civil court, where the admissibility of confessions is governed by a different body of law.

I therefore hold the evidence of the confessions and admissions by each of the three defendants in the Provost Marshal's office to be admissible.

█ Upon the merits, I find the defendants, Simpson, Chambers, and Smyth, guilty of robbery as charged. Although the defendants Chambers and Smyth did not actually assault or take property from the complainant's person, by their own admissions they aided and abetted Landini and Simpson therein, together with them planning the robbery and participating in the offense as lookouts.

This determination is made exclusive of any testimony by the defendants on the witness stand and any evidence of admissions or confessions after arrest or arraignment.

The case will be referred to the Probation Officer for presentence reports.

---

Defendant Simpson, on cross-examination by the Assistant United States Attorney:

"Q. Now, when Officer Xander began to ask you these questions, you didn't say you didn't want to answer, did you? A. No, sir, I didn't.

"Q. And you didn't tell this Air Force representative that you didn't want to answer? A. No, sir, I didn't.

"Q. In fact, whatever was asked you, you answered voluntarily, didn't you? A. Yes, sir.

"Q. And you wanted to do it because you wanted to tell your story of what happened, is that right? A. Yes, sir."

5. United States v. Mitchell, 322 U.S. 65, 70–71, 64 S.Ct. 896, 88 L.Ed. 1140; Trilling v. United States, supra.

6. 10 U.S.C. § 881. Art. 31. Compulsory self-incrimination prohibited

"(a) No person subject to this chapter may compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him.

"(b) No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

"(c) No person subject to this chapter may compel any person to make a statement or produce evidence before any military tribunal if the statement or evidence is not material to the issue and may tend to degrade him.

"(d) No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial."